UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PAYCHEX BUSINESS
SOLUTIONS, LLC, ET AL.,

       Plaintiffs,

v.                                                                 Case No. 8:15-cv-1455-T-24 TGW

UNITED STATES OF AMERICA,

       Defendant.
_____/

# **ORDER**

       This cause comes before the Court on the following cross-motions: (1) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 43), which Defendant opposes (Doc. No. 46); and (2) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the Alternative, Motion for Summary Judgment (Doc. No. 42), which Plaintiffs oppose (Doc. No. 47). As explained below, the Court grants Plaintiffs' motion and denies Defendant's motion.

       The central issue before the Court is whether Plaintiffs are the statutory employers, as defined in 26 U.S.C. § 3401(d)(1), of their clients' employees. The parties filed cross-motions for summary judgment on this issue. The Court has viewed the evidence in the light most favorable to Defendant and concludes that Plaintiffs are the statutory employers under § 3401(d)(1). As a result of that conclusion, the Court finds that Defendant has waived sovereign immunity for Plaintiffs' tax refund claims, and as such, this Court has subject matter jurisdiction over this matter.

## **I. Standard of Review**

       Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background[1]

During the relevant time period, Plaintiffs were professional employer organizations ("PEOs") headquartered in Florida and licensed by the State of Florida. (Doc. No. 43-1, ¶ 6). As PEOs, Plaintiffs would enter into a client service agreement ("CSA") with each client company customer in order to provide all employer payroll functions and certain human resource functions. (Doc. No. 43-1, ¶ 7–8).

The CSAs generally provide that Plaintiffs assumed responsibility for the payment of wages to the clients' employees ("worksite employees") during the terms of the CSAs without regard to whether the client companies first paid such amounts to Plaintiffs.[2] (Doc. No. 43-1,

---

[1]The case involves claims for tax refunds for certain periods from 2009 through 2012. The facts relate to the periods at issue.

[2]Not all of the CSAs limited Plaintiffs' responsibility for the payment of wages without regard to whether the client companies first paid such amounts to Plaintiffs; some of the CSAs limited Plaintiffs' responsibility only to situations where such was required by state law. (Doc. No. 43-46 through 43-56). However, it appears that these CSAs were governed by Florida law,

2

¶ 11). Additionally, the CSAs provide that Plaintiffs assumed full responsibility for the reporting, collection, and payment of payroll taxes to the IRS. (Doc. No. 43-1, ¶ 12). These obligations also arise under Florida law, specifically Florida Statute § 468.525(4). Section 468.525(4) provides the following:

> The employee leasing company's contractual arrangements with its client companies shall satisfy the following conditions, whereby the leasing company . . . (b) [a]ssumes responsibility for the payment of wages to the leased employees without regard to payments by the client to the leasing company[; and ] (c) [a]ssumes full responsibility for the payment of payroll taxes and collection of taxes from payroll on leased employees.

Fla. Stat. § 468.525(4)(b)–(c).

With respect to Plaintiffs' assumption of the responsibility for the payment of wages to the worksite employees, Plaintiffs describe the payroll process as follows: Typically, two days prior to the date on which the worksite employees were paid, Plaintiffs obtained certain payroll information from the client companies. (Doc. No. 43-1, ¶ 14). Specifically, the client companies would submit the worksite employees' hours and rates of pay to Plaintiffs for the pay period at issue. (Doc. No. 43-1, ¶ 15). Plaintiffs had the worksite employees' Forms W-4 and knowledge of their necessary payroll deductions for benefit plans and garnishments. (Doc. No. 43-1, ¶ 26).

---

and Florida Statute § 468.525(4) requires that Plaintiffs assume responsibility for the payment of wages without regard to whether the client companies first paid such amounts to Plaintiffs. (Doc. No. 43-46 through 43-52; Doc. No. 43-55; Doc. No. 43-56). It appears that for client companies that have worksite employees located in Alabama, there may be some instances in which Plaintiffs assumed the responsibility only to pay the worksite employees' wages and to collect, report, and remit payroll taxes to the extent that the client companies first funded these obligations. (Doc. No. 43-53; Doc. No. 43-54). Regardless of which form of the CSA was used or in what state the worksite employees were located, Plaintiffs undertook the responsibility to make the wage payments to the employees (even if Plaintiffs required client funding first for employees in Alabama).

Plaintiffs then calculated the appropriate amount of wages and payroll taxes. (Doc. No. 43-1, ¶ 17). Thereafter, Plaintiffs would initiate a debit to the client companies' bank accounts via automated clearing house ("ACH"), which would include amounts for the employees' compensation and FICA taxes.[3] (Doc. No. 43-1, ¶ 22–23; Doc. No. 42-4, p. 11 of 18).

The ACH process did not ensure that Plaintiffs received payment from the client companies prior to the issuance of payroll checks or direct deposits to the worksite employees. (Doc. No. 42-4, p. 11 of 18). There was a lag of at least three business days between when Plaintiffs' debit was presented to each client company's bank and when Plaintiffs could confirm that the transfer of funds from each client company was successful (or that one or more client companies had insufficient funds). (Doc. No. 43-12, ¶ 19). On the same date that Plaintiffs debited the client companies' bank accounts, Plaintiffs arranged for the direct deposits or checks for the worksite employees' wages. (Doc. No. 43-12, ¶ 11, 14–15). Thus, the initiation of wage payments to the worksite employees occurred before Plaintiffs had confirmation that the client companies had sufficient funds to cover the corresponding debit to the client companies' bank accounts. (Doc. No. 43-12, ¶ 21–24). Once Plaintiffs initiated the direct deposits for the payment of the employees' wages, the direct deposits could not be changed. (Doc. No. 43-12, ¶ 17).

During the many instances in which a client company did not have sufficient funds in its bank account from which Plaintiffs could debit the amount owed for that pay period, Plaintiffs would not learn of the insufficiency of funds until after Plaintiffs had made the wage payments to

---

[3] Plaintiffs required small percentage of their client companies (approximately 50 to 100 such client companies) to pay via wire, as opposed to ACH, when warranted by concerns over such clients' financial condition. (Doc. No. 42-4, p. 11 of 18; Doc. No. 47-1, ¶ 5).

the worksite employees. (Doc. No. 42-4, p. 11–12 of 18). In those instances, Plaintiffs would have to seek payments from the client companies through collection actions, which did not guarantee payment from the client companies. (Doc. No. 42-4, p. 12 of 18).

Plaintiffs used their own bank accounts to make the wage payments to the worksite employees, as well as to pay the payroll taxes to the IRS. (Doc. No. 43-12, ¶ 9; Doc. No. 43-13, ¶ 13; Doc. No. 47-1, ¶ 6; Doc. No. 47-2, ¶ 7). The client companies had no authority over, or access to, these bank accounts. (Doc. No. 43-12, ¶ 10; Doc. No. 43-13, ¶ 14; Doc. No. 47-1, ¶ 6; Doc. No. 47-2, ¶ 8).

With respect to Plaintiffs' assumption of the responsibility for the collection and payment of payroll taxes, the component of the payroll taxes at issue in this case is the FICA tax; more specifically, the employer's portion of the Social Security tax. FICA taxes are comprised of Old-Age, Survivors, and Disability Insurance ("Social Security") taxes and Hospital Insurance ("Medicare") taxes. (Doc. No. 43-1, ¶ 30). During the periods at issue, the employer portion of Social Security taxes equaled 6.2% of the worksite employees' wages. (Doc. No. 43-1, ¶ 30). However, the Social Security taxes are payable only up to a certain threshold taxable wage base. (Doc. No. 43-1, ¶ 30).

Each time Plaintiffs entered into a CSA with a new client company, Plaintiffs restarted the Social Security taxable wage base for that client company's worksite employees. (Doc. No. 43-1, ¶ 31). The parties agree that Plaintiffs' decision to restart the Social Security taxable wage base for the client company's worksite employees was erroneous,[4] and as such, it is undisputed

---

[4] The decision was erroneous because the client companies at all times remained the worksite employees' common law employers, despite the fact that the client companies entered into CSAs with Plaintiffs.

that in some instances this led to the overpayment of the employer's portion of the Social Security tax. (Doc. No. 43-1, ¶ 31). Plaintiffs paid the employer portion of the Social Security tax associated with the restarting of the Social Security taxable wage base from their own bank accounts. (Doc. No. 43-1, ¶ 32).

Plaintiffs reported their payment of the employer portion of the Social Security tax on Forms 941 using their own names, addresses, and employer identification numbers ("EINs"). (Doc. No. 43-1, ¶ 33; Doc. No. 43-13, ¶ 6, 12). The client companies no longer filed these federal employment tax returns after entering into CSAs with Plaintiffs, and Plaintiffs did not file these federal employment tax returns using the names, addresses, or EINs of the client companies. (Doc. No. 43-13, ¶ 6). Plaintiffs did this because they had assumed full responsibility for the reporting, collection, and payment of payroll taxes with respect to the worksite employees, and thus, Plaintiffs considered themselves to be the statutory employers of the worksite employees. (Doc. No. 43-13, ¶ 7, 10–12).

After Plaintiffs realized that they had erroneously restarted the Social Security taxable wage base for the client companies' worksite employees, Plaintiffs filed Forms 941-X to claim refunds for the overpayments of the employer's portion of the Social Security taxes for several tax periods from 2009 through 2012. (Doc. No. 43-13, ¶ 16). The IRS denied Plaintiffs' claims for refunds, and this lawsuit seeking the refunds followed. (Doc. No. 43-13, ¶ 18).

### III. Statutory Employer Under § 3401(d)(1)

The central issue in these cross-motions is whether Plaintiffs are the statutory employers of the worksite employees, as defined by 26 U.S.C. § 3401(d)(1). Pursuant to 26 U.S.C. § 3111(a), the Social Security tax is imposed on every employer equal to 6.2% of the wages paid

by the employer. Furthermore, 26 U.S.C. § 3401(d) defines "employer" as follows:

> [T]he term "employer" means the person for whom [the worksite employee] performs or performed any service, . . . except that . . . if the person for whom [the worksite employee] performs or performed the services does not have control of the payment of wages for such services, the term "employer" . . . means the person having control of the payment of such wages.

26 U.S.C. § 3401(d)(1).[5] Thus, the issue before this Court is who—Plaintiffs or the client companies—had control over the payment of wages to the worksite employees. As explained below, the Court finds that Plaintiffs had control over the payment of wages to the worksite employees, and as such, Plaintiffs are the § 3401(d)(1) statutory employers of the worksite employees.

The trend in the case law shows that the person or entity that controls the bank account from which wages are paid is the § 3401(d)(1) statutory employer. For example, in Educational Fund of the Electrical Industry v. United States, 426 F.2d 1053, 1055–56 (2d Cir. 1970), employers of electricians paid money into a vacation fund, and excess money from the vacation fund was transferred into an education trust fund. When an electrician satisfactorily completed a week-long training course, the trustees of the education trust fund paid the electricians $140 for wages lost while attending the training. See id. The education trust fund did not withhold income taxes from the $140 distributions, and as a result, the IRS assessed a tax deficiency against the education trust fund. See id. at 1056.

---

[5] Section 3401(d)(1) states that it is defining "employer" for the purposes of Chapter 24, and the Social Security tax (which is part of FICA) is imposed under Chapter 21. However, the Supreme Court has used the § 3401(d) definition of "statutory employer" (meaning the person having control over the payment of wages) for FICA purposes. See Otte v. U.S., 419 U.S. 43, 50–51 (1974).

The education trust fund paid the assessment and then filed a claim for refund, arguing that it was not the electricians' employer. See id. at 1056–57. The court rejected the education trust fund's argument, finding that it was the statutory employer under § 3401(d)(1), because the education trust fund controlled the payment of the $140 distributions to the electricians. See id. at 1057. The court also rejected the education trust fund's argument that it was a mere conduit for the employers' money that was ultimately transferred into the education trust fund and used to pay the $140 distributions. See id. Specifically, the court stated that "[t]he purpose of Section 3401(d)(1) is to provide that the person actually paying the wages (instead of the employer who makes a payment into a fund for the benefit of all his employees) is obligated to withhold the taxes." Id. Because the education trust fund was the payer of the $140 distributions, the court found that the education trust fund was the statutory employer that had legal control of the payment under § 3401(d)(1). See id.

Likewise, in Matter of Southwest Restaurant Systems, Inc., 607 F.2d 1237, 1239 (9th Cir. 1979), the issue before the court was the identity of the corporation(s) that controlled the payment of wages. In Southwest Restaurants, the debtor-corporation and three other corporations had similar ownership. See id. at 1238. The wages of the employees of all four corporations were paid from the debtor-corporation's payroll account, with funds transferred into it from all four corporations (depending on which corporations had money in their accounts). See id. The debtor-corporation reported (but did not pay) the withholding taxes for all four corporations in the debtor-corporation's name. See id.

Thereafter, the debtor-corporation filed for bankruptcy, and the government filed a proof of claim for unpaid employment taxes. See id. at 1239. The trustee objected to the proof of

8

claim, because part of it related to taxes due and owing from the three other corporations. See id. The issue before the court was whether the debtor-corporation or the three other corporations were the employer(s) liable for the withholding taxes. See id.

In analyzing the issue, the court stated the following:

> [T]he common law employer is normally the person who is liable to withhold and to pay over to the Internal Revenue Service both income and FICA taxes. However, under certain unusual circumstances if the common law employer does not have control of the payment of the wages for such services then the person who does have such control steps into his shoes for this purpose.

Id. Thereafter, the court noted that in the case of Otte v. United States, the Supreme Court stated that the definition of "employer" under § 3401(d)(1) "'intended to place responsibility for withholding at the point of control.'" Southwest Restaurants, 607 F.2d at 1240 (quoting Otte v. U.S., 419 U.S. 43, 50 (1974)). As a result, the Southwest Restaurants court concluded that the debtor-corporation controlled the payment of wages and thus was the § 3401(d)(1) statutory employer, stating the following:

> No one other than the person who has control of the payment of the wages is in a position to make the proper accounting and payment to the United States. It matters little who hired the wage earner or what his duties were or how responsible he may have been to his common law employer. Neither is it important who fixed the rate of compensation. When it finally comes to the point of deducting from the wages earned that part which belongs to the United States and matching it with the employer's share of FICA taxes, the only person who can do that is the person who is in "control of the payment of such wages." . . . [T]here is nothing inequitable in the placing of such a burden upon a corporation which voluntarily places itself in the position of handling the wages and reporting the amounts due under the taxing statutes but which then fails to deduct and remit the amounts required by law.

Southwest Restaurants, 607 F.2d at 1240.

9

Similarly, in Winstead v. United States, 109 F.3d 989, 991 (4th Cir. 1997), the issue before court was the identity of the person who had control over the payment of wages. In Winstead, Winstead entered into agreements with sharecroppers to grow tobacco on his land, with Winstead and the sharecroppers splitting the profits. See id. at 990. The sharecroppers hired migrant farm workers as day laborers, but most sharecroppers were unable to pay the day laborers until after the tobacco was sold. See id. As a result, Winstead paid the day laborers directly from his own checking account and then deducted that amount from the sharecroppers' share of the profits. See id.

The IRS assessed FICA taxes against Winstead relating to the wages he had paid to the day laborers. See id. at 990–91. Winstead paid the assessment and then brought a refund action, claiming that he was not the employer of the day laborers. See id. at 991. The court concluded that Winstead was the § 3401(d)(1) statutory employer with control over the payment of wages, because Winstead paid the day laborers directly from his own account, over which the sharecroppers had no authority. See id.

Likewise, in Consolidated Flooring Services v. United States, 38 Fed. Cl. 450, 457 (1997), the issue before the court was the identity of the person or entity that had control over the payment of wages. In Consolidated Flooring, the plaintiff contracted with installers to install flooring, and the installers would complete the installation jobs using a work crew of "helpers." See id. at 451–52. After a 1987 audit, the plaintiff changed its payment practices such that it would find out how much the installers owed their helpers, and the plaintiff would deduct that amount from its payments to the installers. See id. at 454. The plaintiff would then pay the installers' helpers directly. See id.

The issue before the court was whether the plaintiff had control over the payment of wages to the helpers and thus was the helpers' statutory employer. See id. at 457. The court concluded that the plaintiff was the statutory employer of the helpers, stating:

> Only the party with control of the account from which wages are paid can, ultimately, control the amount of payment and whether payment actually occurs. Further, the person who distributes wage payments from their account is the person best able to account for the amount of the distributions to employees, and to ensure that taxes are withheld on those payments. The Court holds, therefore, that the party with control over the payment of such wages under 26 U.S.C. § 3401(d)(1), is the party with control of the account from which wages are paid.
>
> In the present case, [the plaintiff] controlled the account, and therefore controlled the payment of wages to the installers' helpers. . . . Payments to the helpers were drawn on [the plaintiff's] account. Thus, even though the installers determined the wage paid to their helpers, [the plaintiff] was the party which controlled the payment of those wages. Under 26 U.S.C. § 3401(d)(1), therefore, [the plaintiff] was the "employer" of the installers' helpers. As statutory employer under § 3401(d)(1), [the plaintiff] was responsible for paying and withholding employment taxes on the installers' helpers.

Id. at 459.

Finally, in United States v. Total Employment Company, Inc., 305 B.R. 333, 340 (M.D. Fla. 2004), this Court reached the same conclusion—that the party that actually makes the wage payments is the party that has control over the wages and thus is liable to the IRS for payroll taxes. In Total Employment, the debtor was an employee leasing company as defined by Florida Statute § 468.520, and the IRS filed proof of claims in the debtor's bankruptcy for unpaid federal employment taxes. See id. at 334.

This Court noted that Florida Statute § 468.525(4), as well as the debtor's contracts with its client company, provided that: (1) the debtor assumed full responsibility for the payment of

11

wages to the leased employees without regard to whether the client company paid the debtor; and (2) the debtor assumed full responsibility for the payment of payroll taxes and collection of taxes from payroll on the leased employees. See id. at 335–36. Additionally, the debtor's contract with the client company provided that the funds the client company owed the debtor became payable to the debtor prior to the debtor's issuance of payroll checks to the leased employees each period. See id. at 336.

In January of 2000, when the client company had insufficient funds to prepay the debtor for payroll, the debtor paid the client company's employees, but the debtor did not pay the related employment taxes. See id. When the client company began paying the debtor again, the client company paid the debtor only the net payroll amount owed to the employees, and as a result, the debtor did not pay all of the related employment taxes. See id. at 336–37. The IRS assessed a deficiency for these tax under-payments and began collection efforts against the debtor. See id. at 337.

The debtor and the IRS agreed that the client company was the employees' common law employer, so the issue before the Court was whether the debtor was the § 3401(d)(1) statutory employer in control of the payment of wages. See id. at 338. This Court concluded that the debtor had control over the payment of wages to the employees. See id. In support of this conclusion, this Court cited Otte, Southwest Restaurant, and Consolidated Flooring as cases that had addressed the meaning of the phrase "having control of the payment of such wages" in § 3401(d)(1), and this Court noted that those cases determined that the phrase referred to "the person or entity actually making payment or having control of the bank account from which payment is made." Id. at 339 (citations omitted). The Court found that the debtor was the §

3401(d)(1) statutory employer and rejected the IRS's argument that the client company was actually the entity in control of the payment of wages because the client company was required to advance funds to the debtor prior to the debtor's payment of wages to the employees. See id. at 338–39.

Based on the cases discussed above, this Court concludes in the instant case that Plaintiffs are the statutory employers of the worksite employees, because Plaintiffs actually controlled the accounts from which the wage payments were made. The client companies had no authority over, or access to, these bank accounts.

This Court rejects Defendant's arguments that: (1) Plaintiffs are merely conduits for the client companies' funds due to the client companies' accounts being debited prior to the payment of wages to the worksite employees; and (2) the client companies are the entities actually in control of the payment of wages to the worksite employees, because the wage payments are contingent on or proximately related to prior receipt by Plaintiffs of the client companies' funds. These arguments were rejected by Educational Fund and Total Employment, and this Court finds those well-reasoned cases to be persuasive. See Educational Fund, 426 F.2d at 1057; Total Employment, 305 B.R. at 338–39. Furthermore, this Court notes that Plaintiffs were not able to confirm that the client companies that paid via ACH had sufficient funds in their accounts prior to Plaintiffs making the wage payments to the worksite employees, and this uncertainty regarding the sufficiency of the client companies' funds prior to Plaintiffs making the wage payments undercuts Defendant's conduit and control arguments.

Additionally, this Court rejects Defendant's related argument that Plaintiffs must have *exclusive* control over the payment of wages and such *exclusive* control is missing because the

wage payments were contingent on or proximately related to prior receipt by Plaintiffs of the client companies' funds. The correct inquiry is whether Plaintiffs have exclusive control over the bank accounts from which the wage payments were made, and the undisputed evidence shows that Plaintiffs did have such exclusive control.

Finally, the Court notes that Defendant urges this Court to disregard its decision in Total Employment and instead rely on two earlier cases—In re Professional Security Services, 162 B.R. 901 (Bankr. M.D. Fla. 1993), and United States v. Garami, 184 B.R. 834 (M.D. Fla. 1995). As explained below, the Court is not persuaded by the Professional Security Services and Garami cases.

In Professional Security Services, the issue before the court was the debtor's objection to the IRS's claim for unpaid FICA and FUTA taxes. 162 B.R. at 902. The debtor was the common law employer of worksite employees that it had leased from another company, PTI. See id. at 903. Under the lease agreement, PTI prepared payroll and paid the payroll taxes after first receiving payment of such funds from the debtor. See id. The debtor objected to the IRS's claim for the payroll taxes, because PTI was the entity that paid the worksite employees and was required to pay the payroll taxes under the lease agreement. See id. The IRS disagreed, arguing that PTI's function was purely ministerial, and as such, the debtor remained liable for the payment of the payroll taxes. See id.

The court considered § 3401(d)(1) and concluded that the debtor retained control over the payment of wages, because PTI did not issue wage checks to the worksite employees unless it first received payment from the debtor. See id. at 904. However, the court implied that PTI also had control over the payment of wages, stating:

14

> This leaves for consideration the issue of whether the Debtor relieved itself of the obligation to pay employment taxes by delegating that function to PTI. The law is clear that the person assessed cannot establish that he is not the person responsible merely by showing that he delegated the taxing responsibility to someone else, for the holding of employees' taxes is considered an important fiduciary duty that cannot be delegated. *The existence of other responsible parties who also control disbursement and have the requisite status, duty, and authority does not relieve the party assessed of his own responsibility.* Furthermore, reasonable cause for failure to timely perform federal employment tax obligations cannot be proven merely by showing that the responsibility for performing this obligation has been assigned to an employee or agent of the taxpayer, because each taxpayer has a non-delegable duty to timely perform its federal employment tax obligations. Based on the foregoing, this Court is satisfied that the Debtor was not relieved of the duty to pay the employment taxes, even though the Debtor contracted with PTI for PTI to do so.

Id. (internal citations omitted and emphasis added).

Likewise, in Garami, the issue before this Court was the debtor's objection to the IRS's claim for unpaid FICA taxes. 184 B.R. at 836. The debtor ran a cleaning business ("Tidy Maid") and leased its cleaning employees from Sunshine Staff Leasing, Inc. ("Sunshine"). See id. at 835. Per their agreement, Sunshine paid the cleaners and was supposed to pay the cleaning company's employment taxes. Id. at 838. As a result, the debtor argued that Sunshine, not the cleaning company, was responsible for the taxes at issue and that the IRS's tax claim should not be allowed. See id. at 836. The Court rejected the debtor's argument, citing to Professional Security Services, and stating the following:

> Although Sunshine contractually agreed to pay the employment taxes of Tidy Maid's cleaners, such an agreement does not relieve the actual employer, Tidy Maid, of the obligation to pay those taxes. Because each taxpayer has a non-delegable duty to timely perform its federal income tax obligations, a contract with a third party does not relieve it of its duty to do so. Therefore, in the instant case although the

> Debtor may have paid the appropriate taxes to Sunshine for forwarding to the United States, until payment is actually made to the government, the responsibility for such payment rests on the shoulders of the Debtor.

Garami, 184 B.R. at 838 (citation omitted).

This Court is not persuaded by Defendant's reliance on Professional Security Services and Garami. This Court, in Total Employment, has previously rejected reliance on the Professional Security Services opinion, stating:

> [The debtor] points to In re Professional Security Services, Inc. for support of its proposition that the client company is actually in control of the payment of wages because it must provide the funds in advance to the employee leasing company before the wages are paid. While Professional Security Services does contain language to that effect, it does not hold that the employee leasing company is not also responsible for the payment of payroll taxes. Its holding is that a common law employer cannot avoid its federal employment tax obligations merely by showing that the responsibility for performing the obligation had been assigned to a third party.
>
> \*   \*   \*
>
> This Court holds that, under the statutory framework in Florida, the client company in an employee leasing arrangement is the common law employer of the leased employees and the employee leasing company is the statutory employer. Both are responsible to the IRS for the withholding requirements on employee income and for the collection and payment of payroll taxes.

Total Employment, 305 B.R. at 338–39, 341 (internal citation omitted). Thus, this Court agrees with the Total Employment decision that the holding in Professional Security Services (and, by extension, the holding in Garami) is that the common law employer remains liable for unpaid employment taxes. Such a conclusion does not undercut the holdings in the other cases cited above that the IRS can also look to the § 3401(d)(1) statutory employer for payment of unpaid employment taxes.

Accordingly, the Court finds that Plaintiffs are the statutory employers of the worksite employees in the instant case. As such, the Court grants Plaintiffs' motion and denies Defendant's motion on this issue.

## IV. Waiver of Sovereign Immunity

Defendant also argues that this Court lacks subject matter jurisdiction over this case, because Defendant has not waived its sovereign immunity to be sued by Plaintiffs, whom Defendant characterizes as third-party, volunteer payers of the FICA taxes at issue. Defendant has waived sovereign immunity for this type of tax refund case only to the extent set forth in 28 U.S.C. § 1346(a)(1), which provides the following:

> The district courts shall have original jurisdiction . . . of . . . [a]ny civil action against the United States for recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

28 U.S.C. § 1346(a)(1).

Defendant argues that Plaintiffs are simply third-parties that volunteered to pay their client companies' tax liabilities, and as such, Plaintiffs lack standing to sue for the refunds. In support of this contention, Defendant points out that "[t]he rule is firmly established that taxes voluntarily paid cannot be recovered back, and payments with knowledge and without compulsion are voluntary." Chesebrough v. United States, 192 U.S. 253, 262 (1904).

However, the Court has already found that Plaintiffs are the § 3401(d)(1) statutory employers of the worksite employees, and as such, they are the taxpayers responsible for reporting and paying the FICA taxes at issue. Accordingly, the Court rejects Defendant's

argument that Plaintiffs are simply third-parties that volunteered to pay their client companies' tax liabilities. Instead, the Court concludes that Plaintiffs have standing to sue for the refunds at issue.

Because Plaintiffs believed themselves to be the § 3401(d) statutory employers, Plaintiffs filed Forms 941 for each period in their own names using their own EINs.[6] In response to Plaintiffs' Form 941 submissions, Defendant, itself, treated Plaintiffs as the taxpayers who owed the FICA taxes at issue. Specifically, Plaintiffs have filed their Forms 4340 (which are essentially transcripts detailing transactions), which come from Defendant and show the IRS's assessments, collections, penalties, and refunds with respect to Plaintiffs. (Doc. No. 47-2 through 47-18).

Next, Defendant argues that Plaintiffs lack standing to sue, because they did not have a financial interest in the amounts sought to be refunded (due to the client companies reimbursing Plaintiffs for the amounts Plaintiffs paid in FICA taxes). In support of this contention, Defendant cites Delaune v. United States, 143 F.3d 995, 1006 (5th Cir. 1998), in which the court stated that "standing is limited to the party or parties who have at least arguably or derivatively made an actual overpayment, such that they have a financial interest in the litigation."

However, the undisputed facts show that Plaintiffs were the ones that actually made the FICA payments to the IRS from accounts that solely belonged to, and were controlled by, Plaintiffs. Furthermore, according to Thompson v. United States, 429 F. Supp. 13, 15 (E.D. Penn. 1977), Plaintiffs' payment of the FICA taxes using money controlled by them, is sufficient

---

[6]Plaintiffs have filed employment tax returns and made payroll tax payments in their owns names and using their own EINs with respect to hundreds of thousands of worksite employees for more than twenty years. (Doc. No. 47-2, ¶ 36).

18

to give them standing to seek the refunds.

In Thompson, the plaintiff was carrying luggage containing $40,055 in cash while at the airport. See id. at 14. The plaintiff was detained at the airport because she fit the profile of a potential hijacker, and the agents detaining her discovered the cash and notified the IRS. See id. The IRS determined that the plaintiff owed that amount towards her unpaid income taxes, assessed taxes of $40,055 against her, and retained all of the cash. See id. Thereafter, the plaintiff filed tax returns for the periods at issue, which resulted in less tax liability than the $40,055 that the IRS had taken from her. See id. Thereafter, she filed a claim for refund of the excess amount that she had paid. See id.

During discovery, the plaintiff testified that the $40,055 in cash that the IRS took did not belong to her; instead, she was a courier transporting the money to a man named Joe. See id. As a result, she amended her complaint to allege that she was carrying the money as a bailee. See id. The government responded by arguing that since "Joe's" money had been used to pay the plaintiff's taxes, the plaintiff lacked standing to sue for a refund. See id. The court rejected the government's argument, stating:

> The Government's reliance upon plaintiff's avowed status as a bailee to establish her lack of standing is misplaced, for implied in her status as a bailee is the obligation to turn the funds over to the bailor. Moreover, [26 U.S.C. § 6402(a), which provides that the IRS may provide refunds for overpayments[7]] contains no requirement that a refund claimant establish ownership of the amount claimed. All that need be shown is that the person seeking the refund is the person who made the overpayment. Here, the money in question was taken from

---

[7] 26 U.S.C. § 6402(a) provides: "In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall . . . refund any balance to such person."

> plaintiff's possession, acknowledged by a receipt given to her, and applied to taxes assessed against her. The fact that some third person may have a superior claim to the money once it is refunded to plaintiff does not alter the fact that she is the "person who made the overpayment" within the meaning of § 6402(a). She therefore has standing to maintain the instant refund action.

Id. at 15.

Based on the above, the Court finds that Defendant waived its sovereign immunity for Plaintiffs' refund claims and that Plaintiffs have standing to sue. Accordingly, the Court denies Defendant's motion to dismiss or for summary judgment on this issue.[8]

## V. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 43) is **GRANTED**.

(2) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the Alternative, Motion for Summary Judgment (Doc. No. 42) is **DENIED**.

(3) The Court will issue a third amended scheduling order.

**DONE AND ORDERED** at Tampa, Florida, this 22nd day of June, 2017.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

---

[8] The Court rejects without further discussion Defendant's argument that Plaintiffs' refund claims should not be allowed, because allowing them would result in an inequitable windfall for Plaintiffs due to the fact that Plaintiffs invested the money they received from the client companies between the time they received the funds and the time that the tax payments were due. If the Court were considering inequitable windfalls, the Court would consider the fact that Defendant appears to agree that the taxes at issue were overpaid, resulting in a windfall to Defendant if not refunded to Plaintiffs. Defendant appears to concede that the statute of limitations has run to the extent that the client companies would otherwise be entitled to seek a refund of these overpaid taxes. (Doc. No. 46, p. 14).